Good morning, Illinois Appellate Court, 1st District. Court is now in session. The 3rd Division, the Honorable Justice Nathaniel House Jr. presiding, case number 1-9-0366, People v. Alonzo Bale. Good morning. This case is being heard via Zoom because of the COVID crisis. My name is Nathaniel House. I'm presiding over the case with Justices Margaret McBride and David Ellis. This is the procedure we're going to follow. We're going to allow each side to have 10 minutes of uninterrupted presentation, and after that presentation, the judges will have an opportunity to ask questions if they have any. The appellant will be allowed to retain a little bit of time for rebuttal, and we will try to stay on schedule today because we do have another argument scheduled for after this one, so we'll try to stick to our time limits. The parties who are going to make a presentation on behalf of the litigants, please state their names and the party they represent, beginning with the appellant. Good morning, Your Honors. Richard Dvorak, D-V-O-R-A-K, on behalf of the appellant. And Daniel Pivovarchuk, on behalf of the people of the state of Illinois. All right. Do either one of you have any questions about how we're going to proceed today? No, Your Honor. All right. All right. Very well, Mr. Dvorak, you may proceed when you're ready. Thank you, Your Honor. The last time I did this, I was standing, but is it okay if I sit? I don't know what the normal procedure is. Absolutely. Okay. Thank you. Okay, so I'll briefly just go through one by one with the ineffective assistance of counsel claim, and then feel free to give me the brief, so I'll try to be fairly quick about going through it. Number one would be the failure to object to the opening statements. In this case, the co-counsel for the defendant made a statement, an opening statement, saying that neither client would testify. Obviously, that means that he spoke on behalf of the defendant, who is not his client. There was a post-trial hearing, and defense counsel admitted, defense counsel for the defendant, that he did not clear this with the defendant, that he gave his permission to say whether he would or wouldn't testify to his co-counsel, and certainly did not give him any kind of permission to say that to the jury ahead of time. I think when you allow another attorney to speak on behalf of your client without his permission, and to commit him to not testifying, I think that is a pretty clear indication of ineffective assistance of counsel. I do cite the chronic prejudice standard, also in Downs, an Illinois case, to say that when you abandon your role such as this, you don't have to show prejudice. I think we can, because it certainly hamstrings someone into not testifying before they ever made that decision. Number two, the cross-examination of a faith-made witness, Ms. Weatherspoon. There was an attempt to prove up the cross-examination. I shouldn't say it was an attempt to prove up. There was an attempt to cross-examine the witness to some degree, but it was never proven up. I think co-counsel explained that what his practice is, he just takes the police report, asks the witness about what's in the police report, and if they deny it, the jury will get the point that it was proven up. Obviously, that's so far beyond the rules of evidence, it's unbelievable. That was co-counsel, but certainly it matters in this case. If it was co-counsel, then it could have come in for the defendant's case as well. So, neither of them proved it up. So, if it's not proven up, it didn't exist. So, what did they miss out on? They missed out on impeaching her testimony that she testified at trial, she was only four or five feet away when this occurred, when she told the ambulance personnel that she was 20 feet away. She said there was a two-tone gun. She's very specific about that gun. That was in none of her original statements. She indicated in the original case report that there was only one vehicle. Why is that important? Well, it's very important because in closing argument, for the trial, she testified there were two, and they were situated in such a way that the one car pulled up behind their cars, lit up the scene. And in fact, the prosecutor made very effective use of that in this closing argument by saying this was like the Wrigley Field of crime scenes, okay? But originally, she said there was only one vehicle, which would have completely blown away that argument. There was also no description whatsoever of the shooters, even though at trial, she was very specific about this. I think all of that was very prejudicial because what we had originally, with her original statements, is I think the reasonable inference is that she couldn't identify anyone. She gave no description. It was one vehicle, not two. Couldn't describe any gun with any specificity. The third one, her testifying about her miscarriages that resulted of this, I do understand that you can have some testimony to show injuries, to show, you know, severe bodily harm, et cetera. But when you're testifying about miscarriages you suffered, I mean, that's something that would need expert opinion as if it was related to this. And number two, I don't see how that's even relevant to, I mean, obviously being shot and being in hospital for that long period of time is severe enough to show the injuries. You don't have to get into the failure to object to the closing argument. There were two things that we mentioned. One was that the prosecutor said that the reason the young 15-year-old did not testify in court consistent with his original statements was because it would be a quote-unquote violation if he had continued to point him out in court. That's just nowhere in any of the evidence. That was just something that is complete speculation on behalf of the prosecutor. Secondly, I think he did make a statement that was similar to what occurred in the Blue case and the Johnson case. I mean, obviously those cases were extreme because there were multiple instances of for the jury to align themselves with Ms. Witherspoon. Like you and Ms. Witherspoon are all part of the same team. She's got you. I think that sort of argument is proper, should have been objected to. The introduction of the gun evidence, you know, this is something that you would think would have been properly excluded. And I think everyone was shocked that the defense wanted to bring it in. Think about what they brought in. They brought in the fact that the two co-defendants were committing a crime together, that they ran from the police, that the guns were found when they ran together. I mean, that's a sort of classic prejudicial thing that you would never want in evidence. So why did they bring in evidence? They brought in evidence because they wanted to rebut the idea that the gun on the Twitter picture was the same gun that Ms. Witherspoon said was that gun. Well, first of all, the easiest way to undermine that would have been to originally cross-examine her with the original statements where she doesn't describe any sort of gun whatsoever. But you don't put on a mountain of evidence that's prejudicial to your clients to make one small little point in process. And then even when that occurred, in closing, the prosecutor said, well, guess what? It's not even the same gun anyway. Because if you look at the gun in the photographs with the guns that were recovered, it's not the same gun anyway. So really, this is just another crime committed by Bell and Brown, another gun for another day. It just painted them as horrible criminals. So, and obviously, the state's going to argue that this was trial strategy because it was something that was certainly thought about ahead of time, done on purpose. But I think counsel does admit that this is not some sort of thorough discussion he had with the defendant. And what's a defendant supposed to do? You're my lawyer. You say this is what you want to do. I'm going to defer to you. Which leads us to the Twitter information. I'm going to take this slightly out of order, the Twitter issues. The first, I'm going to argue first, the last issue, or second to last issue that I raised, which was that it shouldn't have been admitted in the first place, just for logical reasons. I think it's easier to deal with it that way. So first of all, should they have been admitted? I'd say no, because there was no proper foundation. We have the one account, which was Landlord Zoe, which is what they're saying is Bell. You've got the other account, which is Dump Street, which they say is Codefendant Brown. And the only way that they were identified as being Bell and Brown was because there were pictures on those that Wetherspoon said looked like the person who did the shooting. It's not like she knew these people beforehand. So first of all, I think the Kent case says that you cannot just, the proper foundation is not, oh, there was a picture associated with an account, because Kent goes into very good detail about how a Facebook account or Twitter for that matter, you can do fake social media accounts, no problem. What evidence is there that that picture was not? And then also the interpretations, I think that was improper to allow these messages that she just completely speculated what they were. I also then want to get into the Bruton issue real quickly. These statements on Twitter by Dump Street were statements that the state said were admissions to the crime. Well, if they were statements by Dump Street, Brown, a Codefendant that admitted to the crime and were used against both of them, that's classic Bruton. It's classic Bruton put into a modern sense of Twitter. So with that, I would defer any time that I have left and then allow the state to... Thank you. Justice Ellis, do you have any questions? Thank you, Justice House. Just a couple. Good morning, Mr. Dvorak. Good morning. One of the first things you talked about was the promise by counsel in opening statement that neither defendant would testify. Did that really hem in your client from testifying if he chose to do so? I mean, in some ways, wouldn't that almost make him look better by doing something that... I mean, look, everybody knows that sometimes all defense attorneys have to deal with the fact that it looks bad when your client doesn't testify. And they always tell the jury, you can't hold it against them. And the big fear is that they will. If he is, according to counsel, not going to testify, but then he decides to testify, wouldn't that just have the benefit of making him look even better? How do you feel like he was barred or hemmed in somehow by that statement by someone who was not even his lawyer? Well, I think it would... All you have is your credibility when you're talking about a trial. And if you promise one thing and do another, A, that's a bad thing. And second of all, it definitely, I think, would look desperate. It would be like, well, we don't think we're going to testify because we don't need to. Okay, we're not going to testify. Don't worry about it. But then you get up and testify anyway. I think it shows desperation. Well, our original plan didn't work out. So let's go to plan B. So I think anytime you have to go to a plan B, it's prejudicial. But at the same time, I think prejudice isn't even necessary in my opinion, because anytime that you do something where you violate those basic principles of confidentiality and disclose something to claim something. So that would apply even if a lawyer said that about his own client in opening statements? Because that would be sharing confidential information with the jury as you see it. Well, no, it would not be if the client authorized that. If the client authorized the attorney to say in opening statements, yes, you can tell them that I'm not going to testify. Um, I think that would be perfectly acceptable. But he but this time, the attorney admitted Bell's attorney admitted he never had that discussion with Mr. Bell shared confidential information with the co counsel that he wasn't going to testify and then further told that to the jury. You think that an attorney can only tell let's just stick with your own client and not someone else's client. You think that an attorney cannot get up on opening and concede to the jury or tell the jury that his client will not be testifying unless he's gotten consent from his client to say that? Correct. The reason I say that judge is because the ultimate decision whether to testify or not testify belongs with the client. And they don't have to do that until the end of the trial. So to say that without permission of the client would be violating the constitutional rights because you're making that decision for the client ahead of time without their permission. Okay. Um, in terms of the Twitter photographs, um, it seems to me that what the trial judge said here is that I mean, if I can dig into her reasoning, and I don't have it in front of me, but I think what she was saying was, look, this is a photograph, and she came upon it doesn't really matter how she came upon it. And when she saw it, she identified the defendant or the defendants. And that's the story of how she came to identify them. And so in terms of foundation, as long as it's a photo that she had, she recognized. And as long as that's being used in part to show her identification and in part to explain the progression as to why are we here today? Why are these two people on trial? It doesn't really matter that it came from Twitter or Facebook or Instagram, or whether it was even a fake one, even if it was a fake account, it could have been a fake account. What matters is it was a photograph that she recognized as the defendant and the co defendant. Isn't that really all she needs to show here? Does it matter? I hear what you're saying about fake posts in that case, Kent, but does any of that really apply here? Judge, I, this is why I would say definitely applies because of the manner in which it was dealt with in this case. It wasn't simply the testimony that I saw a photograph. And based on this photograph, I identified the defendant. That would be completely permissible as a reason for identification. Okay. It might even be permissible to bring in that photograph in a very limited manner. Okay. That just shows the photograph. Okay. But remember what we have here, we have not only the photograph, but we have all of the actual posts themselves with all that extremely prejudicial language that came in as well. The only way that language comes in is if the proper foundation is met, that A, it's the defendant's account so that we can attribute those statements to the defendant. Okay. B, there should be no interpretation allowed. It should be the actual statements themselves. Okay. Even if it was allowed evidence, which it shouldn't have been. Okay. And three, we have to make, remember this was a retweet by the co-defendant of the defendant's statement. So I don't even know how they would be able to say that this was directed at Weatherspoon when there was no evidence that he actually had any contact with Weatherspoon or meant it to be towards Weatherspoon. So I think it was the manner, the overkill in which this was used that was a problem. Okay. So it's not the fact that the photo was put into evidence. That was not what bothers you. It's that there were statements made through slang and symbols and terminology that was attributed to somebody when no foundation was laid that it actually came from those people. Correct. Is that an accurate description of your argument? Correct. Okay. Okay. I don't think I have any other questions. Thank you, Mr. DeBoer. Thank you, Justice Ellis. Justice McBride, do you have any questions? A couple. Just following up on the photos and the language. The judge, the ruling was limited. Didn't the judge say, I'm only letting this in for how this identification and the process of them being connected to this and being arrested came into play? Well, if you're saying does eliminate, I think, in other words, the question is, Justice McBride, would eliminating instruction cure this? I think it's sort of the inference. I don't think so, because there's no reason to bring in all that prejudicial information in the first place. What should have happened is just the photograph itself should have come in with that limiting instruction, that the only reason this photograph is being taken, allowed in evidence, is for this purpose. But what we had here was this plus all of the extraneous statements that didn't need to come in. Well, I wasn't really asking whether eliminating instruction should have been given, but I guess what I wanted to dovetail into was the court's ruling is reviewed by us for an abuse of discretion, right? That's an evidentiary ruling. So, I mean, that's the standard we're looking at. In terms of the statements, which were translated, so to speak, did the state argue in closing much about what those phrases were? Well, I mean... You're not suggesting they did, did you? That's not one of your arguments. I'm not saying that they went on and on about it. However, I think they mentioned it enough, certainly, and the actual pictures themselves were in evidence. I mean, the jury could see those messages, so... Well, all right. And then the lawyer did say that knowing those things were coming in, that was certainly something they couldn't... They had to figure out a way to sort of fight against. So, some of the theory and the actions that the lawyers took were based on the fact that the court had ruled against them on these photos. True? I think, yes. If you're referring to the issue of bringing in the other incident and the gun, yes. All right. As far as the ineffective claims, if we don't agree with your chronic citation that they completely abdicated their role, or the lawyer for your client abdicated his role, then you do have to show prejudice, don't you? It's not simply ineffective representation or the competency of taking certain tasks or tacks for the defense, but also prejudice, right? Correct, yes. All right. As far as the opening statements, too, and closing, the jury was told multiple times, weren't they, that none of this is evidence? That the opening arguments are evidence? Well, at all times, the jury was notified multiple times that anything the lawyers say, either in opening or closing, are not evidence. That is true, Your Honor, but yes, correct. I guess my response to that would be is that the case law is replete with instances of ineffective assistance for things lawyers say in closing arguments, for things they say in opening arguments, and for things that they don't object to when the state says them in both. So if that's the case, then obviously the fact that they're told in every case that what the lawyers say during arguments is not evidence would make that a nullity. That argument could apply in every case is what I'm saying. Well, it traditionally does because we So I don't think it's a nullity. I think that there's a general principle that follows with it, but in any event, I do agree. I mean, I know the idea that you can't unring a bell, so that's all I have at this time. Thank you, Mr. DeBoer. Thank you, Justice McBride. Sometimes when I look at these cases, I switch the facts to see if that gives me a different insight. Let's do a theoretical question about this case. Suppose the defense attorney, given his opening statement, instead of saying the defendant is not going to testify, would this case be any different if he had instead said, these defendants are going to explain to you what happened that night and that they're innocent? Is that case the same as this case we have in front of us? Well, I think they would be equally bad for the same reasons. One is that it was not based on the authorization from the client. And two, you're going back on your promise. In that case, the hypothetical that Your Honor just said, that you go back on the promise that they would testify versus this case, you're going back on your promise that they wouldn't testify. I mean, I just go back to Sam Adams Jr.'s argument in the government of the way of this case. He made that same promise. He said, he's going to testify, he's going to testify, and then he didn't. And then the way he explained it was, well, the state didn't meet their burden, so I didn't need to testify. So I think that can try to be explained away. But if the question is, is it more prejudicial to say they're going to testify, then back off. I would say no, I think both are bad. All right, thank you. I don't have any other questions. Thank you. Okay. Mr. Piewarczyk, I'm sorry if I butchered it. No problem, Your Honor. Dan Piewarczyk, on behalf of the people of the state of Illinois, may it please the court. The most appropriate, the, excuse me, defendant's claims have high burdens, and he simply has not met them in this case. His claims of ineffective assistance all fail because he cannot show manifest error in the trial court's rejection of these same claims after an evidentiary hearing, nor can the defendant show an abuse of discretion in the admission of the Twitter posts. Moreover, defendant's convictions were based on overwhelming evidence, so that even if an error occurred, it did not change the outcome of the trial. With regard to issue one, co-defendant's opening statement, not objecting was reasonable because the comment was accurate, and it was also consistent with their shared defense strategy of keeping focus on the prosecution's burden of proof. The comment was not prejudicial because the defendant was still free to change his mind about testifying, and if he had changed his mind and had testified, and Justice Ellis pointed this out, if he had testified and if he had just changed his mind, that would only have exceeded the jury's expectations. Those were lowered expectations as a result of the opening statement of the co-defendant, and it's the exact opposite of a situation where an attorney promises an opening statement that their client will not. In that situation, you have raised the expectation of the jury beyond simply what they're told, which is that the defendant doesn't have to testify. You've raised those expectations and then disappointed them. Here, that would have been the exact opposite. Also, this is not chronic because the trial counsel's testimony at that evidentiary hearing established that the defendant approved of and benefited from trial counsel's coordination with the co-defendant's attorney. With regard to the cross-examination of the victim, the trial court heard trial counsel's testimony about his cross-examination strategy and found it to be reasonable. Defendants' arguments on this point do not even come close to showing that this finding by the trial court was manifestly erroneous. With regard to the victim's miscarriage testimony, you need to keep in mind that this her long-term injuries. Objecting to this testimony would have unwisely put the trial counsel in the position of disputing the victim's knowledge of her own body. It also would have highlighted the testimony, which remained brief, isolated, and undiscussed because of trial counsel's wise decision not to object to it. In opposing counsel's reply brief, he goes so far to suggest that trial counsel should have cross-examined the victim on her basis of knowledge for these miscarriages, which would have been even more problematic and even more inflammatory. The bottom line is trial counsel handled this exactly right. That's what the trial court found, and that was not manifestly erroneous. With regard to the comments that the prosecutor made in rebuttal, the people properly argued that the juvenile NL recanted because he lacked the courage to come to court and make an identification. This was a reasonable inference based on his demeanor while testifying and the absurdity of his recantation testimony. With regard to the final comment, something along the lines of the victim is not alone because she has you with them. When looked at in context, this absolutely is nothing more than urging the fearless administration of justice. It's nothing more than the kind of language that's frequently used, and it was appropriate. With regard to the recovered gun, trial counsel made a strong and reasonable argument that the recovered gun was the same gun that was in the Twitter post, and that that meant that the victim misidentified it as the attempt murder weapon. This strategy was based on uncontested ballistic evidence and had the potential to also discredit the victim's identification of the defendant. After the evidentiary hearing, the trial court found that this had been a reasonable strategy. The trial court also found that the defendant knowingly and these findings to be manifestly erroneous. Turning to issue two, the trial court's admission of three of the four screenshots was not an abuse of discretion. I'm going to make sure to tailor my argument on this point to the fact that essentially opposing counsel has conceded that the photos themselves were appropriate to be admitted, and it was the but the Twitter posts in all four of those screenshots were the indisputable, indispensable initial step in the victim's identification of the shooters, and the language that accompanied those posts was part of what she saw when she made these identifications. The Twitter posts could not be concealed from the jury without drastically distorting the circumstances of the defendant's identification. And make absolutely no mistake, identification or misidentification was undeniably the central trial issue here. So the question before the trial court was how much the jury should be allowed to see, and the trial court allowed them to see three of the four screenshots. The trial court also excluded the one that posed the most risk of undue prejudice to the defendant. So this was a measured approach and a classic exercise of discretion. And it's important to keep in mind that with an evidentiary ruling, it's only an abuse of discretion if no reasonable person would take the court's view. And that's not, it's simply not what we have here. The screenshots were properly admitted as prior identifications under 115-12. Photographic documentation of a witness's prior out-of-court identification assists the trier of fact in evaluating the identification's exemplified by the routine introduction of lineup photos in criminal trials. And there's no principle basis to treat identifications made on social media and any differently. The most natural and appropriate way to lay the foundation for the admission of photographic documentation of a prior identification is through the testimony of the person who made the identification. This is what happens every time when a witness identifies a lineup photo as truly and accurately depicting the lineup that they viewed. And this is the foundation that was required in this case. People versus Kent did not impose a higher standard, a higher foundational requirement on social media evidence. Kent merely held social media evidence to the same standard as other forms of evidence. And that standard is sufficient evidence to support a finding that it is what its proponent claims it is. Under this set, under that standard, the necessary foundation will differ depending on the proponent's purpose for presenting it. In Kent, the Facebook post was admitted into evidence as an inculpatory statement by the defendant. So as a result, the proper foundation for its admission had to include evidence of the defendant's authorship. In this case, however, that was not required because the Twitter posts were not admitted as inculpatory statements. The admission of three of the four screenshots was also not unduly prejudicial. And this goes directly to the issue of the text that accompanied the photographs. Defendant's misidentification theory needed the Twitter posts to be admitted in full. Without them, would have had no explanation for why the credible and sympathetic victim would repeatedly and unwaveringly identify him as one of the shooters. But with the messages in evidence, the victim's subsequent identifications could be blamed on the suggestiveness of the messages themselves and her interpretation of their meaning. This is also why it was reasonable for trial counsel to not object to this part of the victim's testimony. The defense put it in closing argument, quote, where did she get the identification of the defendants? At the time of the incident? Absolutely not. Zero chance of that. She got the identification through her cell phone, period, end quote. Simply put, defendant cannot be prejudiced by the admission of evidence that was so clearly essential to his defense. And this was not as, my final point is harmless error. Even if an error occurred, it did not change the trial's outcome. Because defendants convictions were absolutely based on overwhelming evidence. Defendant was substantively identified as one of the shooters on two separate occasions by two independent witnesses. The victim and the juvenile NL both identified defendant in physical lineups. The victim again identified the defendant in open court and NL signed the jury. It was also sent back to the jury during deliberations at their specific requests. These identifications corroborated each other and were further corroborated by the physical evidence from the shooting. For all these reasons, and for those in our brief, the people ask you to affirm defendant's convictions and sentence. Thank you. Justice Ellis, do you have any questions? Just a couple. Good morning, counsel. Good morning. Mr. Pivo Varchick. Is that close? That's perfect. Well, great. I wrote it out phonetically. That's what I do too. I just have a couple of questions. So I'm you know, having discussed the matter with your opposing counsel with this photo, counsel does not seem to be aiming his focus at the fact that the photo came in, but in part on the text below it. As I recall the text, or it's not just text, it's emojis, you know, they seem to be threatening, and they seem to be threatening towards her, towards Ms. Witherspoon. Why was that okay? I mean, isn't that going to make a reasonable juror think that they're threatening her to keep quiet? A couple of points. First, the defense did not ask for any redactions. So the defense never said the photographs are okay, but judge, we want to have the messages taken out. That was never a request. But this is a Strickland argument. That's kind of the point, right? It is a Strickland argument. So then it becomes a question of strategy. And here's why it was an absolutely appropriate strategy. Keep in mind that outside of these Facebook, excuse me, these Twitter posts, outside of that, you still had overwhelming evidence, which included two additional identifications by the victim of the defendant as one of the shooters. And without the messages accompanying those posts, you didn't have, as the defense, a way of explaining why, other than the defendant's guilt, that the victim was unwaveringly identifying the defendant as one of the shooters. By taking out, by asking to redact those messages, those threatening messages, it took away the argument that would say, well, of course, she thought these guys were the shooters. She saw their pictures on Twitter, and she saw threatening messages, and she decided that they were the shooters. And then she picked them out in a lineup, and she picked them out at trial. That was the argument that I quoted earlier, saying that she didn't get these identifications from the time of the incident. She got them off of her phone. And so this was absolutely an appropriate strategy. And it goes along with bringing the gun into evidence, because what you have is an argument that, essentially, she identified two innocent people just because somebody put their pictures on Twitter. And then you have a picture of the defendant with a two-tone gun with an extended clip. And then you have, in court, a two-tone gun with an extended clip recovered during the arrest of the defendant that does not match the ballistic evidence at the shooting. So you have a- I know, counsel, but you're mostly talking here about the photos, and I think you've won that argument. Yes, the photos, I understand the strategy. I don't think they could have kept the photos themselves out, and I understand the strategy with the guns, and that's probably, I get it. But the language underneath is threatening language. And in most- it is hard to imagine that somebody would not view that as threats directed to the witness. And I can't imagine how- and by the way, without any foundation, they're actually the people who are- admissions. Threats which are- foundation that they're the ones that sent them. And whether they sent them or not, these guys aren't on trial for intimidating a witness. They're on trial for murder, and the jury is seeing not just these photos, but them saying, basically, underneath it, better not rat us out, Ms. Witherspoon. You think the defense wanted that in? A couple of things, and I want to make sure that I address all your questions. My audio cut out briefly, so if I miss a point, please ask me again, and I'll address it. First of all, the Twitter posts, the language there never says anything about ratting anyone out or that. And we're going off of the victim's interpretation of what these posts said. I agree with you that they're threatening, but they're threatening in the way of her seeing statements about what they did to her and that they may do it- they may try again to kill her. Not directed at her, but discussing it in terms of bragging about it, and essentially her having the opportunity to overhear these statements by them bragging about having shot her. So it's absolutely threatening, and that's true, but it has nothing to do with witness intimidation. There's no comments about ratting them out or anything like that. And that does matter. Your question about whether or not that's something that the defense wanted it, I think it's clear the defense didn't want these Facebook posts in at all. I mean, Twitter posts, I apologize. The defense didn't want these Twitter posts in at all. This was very problematic evidence for them, and it was coming in. So then at that point, they do have to figure out how they're going to spin this. And the fact that the victim testified that she found these posts threatening is absolutely suggestive to her, and it absolutely was argued in closing argument that because of the threatening nature of those posts, then she concluded that they were the shooters. And if you redacted those, then you just have her finding pictures on Twitter, and it essentially becomes a lineup of the whole world. Without any context, her just finding pictures that she identifies as shooters on Twitter becomes more credible because there isn't any context to say, well, you came to a conclusion about them being the ones based off the messages. So yes, at that point, once those posts were coming in, they did need the text to come in as well in order to be able to discredit the subsequent identifications that flowed from it. And the arguments of both trial counsel and co-defendants trial counsel in closing argument, absolutely bear that out as their strategy. And it's important to keep in mind that these were already reviewed by the trial court in an evidentiary hearing where trial counsel testified, where co-defendants trial counsel testified. They explained their approach, and the trial court found it reasonable. The trial court that heard this case found it reasonable. And I think that that's absolutely an important aspect of this. It's also important to keep in mind that the defense did not ask for redactions. And on appeal here, the defendant never raised an argument of ineffective assistance based on not asking for actions. True. Okay. All right. Thank you very much, counsel. Thank you, Justice Ellis. Justice McBride, do you have any questions? Yes. Good morning, Mr. Pivo Varchick. Good morning. As far as the tweets, I mean, if they are threats, if you're acknowledging that, if they're statements of some kind, why isn't there a Bruton problem here for Mr. Bell? There isn't a Bruton problem, because they weren't admitted as admissions. They weren't argued as admissions. And even if you consider them to be admissions, you still have the problem that they don't inculpate each other. This isn't a situation where one defendant is pointing the finger at the other and saying he was the shooter. You don't have them naming each other as the offender. This is banter back and forth between, it's assuming that the victim's interpretation of these posts is correct. There's nothing in there that specifically identifies each other as the shooters. This isn't the kind of thing that would be a Bruton problem. And I cited a case that was similar in my brief that I believe shows that Bruton just doesn't apply. All right. The only other area I want to talk about is the introduction of this other gun. Now, you would have to agree, wouldn't you, that this is a rather unusual strategy of introducing what could be termed evidence of another crime by the introduction of a gun, even though it didn't, it showed that the ballistics, that this gun could not have possibly been the one that was used in this offense? It's unusual. An unusual strategy, isn't it? It's unusual, but I think that usually that kind of opportunity isn't available. It's an unusual set of facts that led the trial counsel to be considering it. But as I spent a good amount of my career in the trial division, and I would have been, as the prosecutor, really worried about that strategy because it did have synergy with the general misidentification theory. I believe trial counsel described it as jujitsu in his testimony at the evidentiary hearing, where you take something that's bad for you and turn it into something good for you. And that's exactly what they're doing. And that's exactly the way that defense attorneys are successful in winning cases, is finding those opportunities. But the bad didn't come from the state's prosecution. The bad came from the lawyers using this gun. I mean, the bad came... I'm not sure, you know, when you have to defend against something that's being presented in the prosecution, that's one thing. But this was not something the state had any plan of bringing out. They weren't going to call the officer for the arrest and that a gun was recovered and that the gun, you know... Do you see what I'm saying? Yes, but let me respond in two ways. First, the bad was the fact that there was this post from Twitter that was coming in where the defendant is wielding a gun that the victim identified as the attempt murder weapon. That's the bad thing. And their attempt to introduce a gun that fits that exact same description and can be pointed to and say, that's the gun in the Twitter post and it doesn't match the ballistics at the scene, that's them trying to make it better. The actual introduction of the gun itself didn't change very much about what the evidence was that was being presented. Absolutely, the prosecution was still going to call the arresting officer to present the circumstances of the defendant's arrest, the fact that he was with the co-defendant at the time, the fact that they fled from a vehicle that matched the description of the vehicle that defendant fled the scene of the shooting in, all that was coming in. The only thing that wasn't coming in was the fact that a gun was recovered. And that additional fact that was introduced through the arresting officer's testimony at the behest of defense counsel and co-defense counsel absolutely provided an opportunity to argue misidentification by saying, look, she misidentified the gun, here's the gun, it wasn't used in the shooting, how can you trust her identification of the guy in the picture also? All right, that's all I have, thank you. Thank you. All right, very well then, Mr. DeVore, you may take a few minutes for a couple minutes for rebuttal. Yes, I'll try to be quick. First of all, the manifest error only goes to certain factual findings, findings such as whether or not this was ineffectiveness or reasonable or legal conclusions that this court must decide de novo. The Bruton issue, it does not have to be mutually inculpatory to satisfy Bruton. I do want to address the issue about whether or not the defense wanted this in about the threatening statements. It was very clear they did not want this in at all, and they didn't want the statements themselves were so prejudicial. So I think it'd be somehow wanted these statements in to explain the identification. I think a much simpler way to do this would have been just to do the traditional way of cross-examining a witness, which is your initial description had no indication whatsoever of a description. It had only one vehicle, not two, 20 feet away. It dovetails back to the original argument that that's the way to undermine her identification, and the identification only came in after she saw the Twitter account. That's a lot easier to deal with than trying to purposefully or wanting in threatening statements from your client. And then finally, with regard to were these statements inculpatory? Of course they were. Was the basis of the admissions? No, the basis was identification, but that doesn't mean they weren't inculpatory. It doesn't mean they weren't admissions. It doesn't mean that they weren't prejudicial, and Bruton applies where there's any statement by the co-defendant that you cannot cross-examine as the defendant. It doesn't matter if the basis was some reason. If it's inculpatory, if it's a statement, if it's prejudicial, you can't cross-examine Bruton applies regardless of the original basis for the issue. And with that, I would defer. Well, either of the justices have any questions based on what we just heard? All right, this matter will be taken under advisement. The case was well argued, both well prepared, and well briefed. We'll take this case under advisement, and a decision will be issued in due course. Thank you.